UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DANIELLE EPPS, | CASE NO. 1:23-CV-01462-BMB |
| Plaintiff, | JUDGE BRIDGET M. BRENNAN |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | REPORT AND RECOMMENDATION |
| Defendant. | |

INTRODUCTION

Plaintiff Danielle Epps challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On July 27, 2023, pursuant to Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry dated July 27, 2023). Following review, and for the reasons stated below, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** for further proceedings consistent with this recommendation.

PROCEDURAL BACKGROUND

Ms. Epps filed for DIB on January 2, 2020, and SSI on February 10, 2020, alleging a disability onset date of November 1, 2018. (Tr. 600, 604). The claims were denied initially and on reconsideration. (Tr. 354-71, 374-85). Ms. Epps then requested a hearing before an Administrative

1

Law Judge. (Tr. 420). Ms. Epps (represented by counsel) and a vocational expert (VE) testified on September 8, 2022. (Tr. 169-202). On October 14, 2022, the ALJ determined Ms. Epps was not disabled. (Tr. 144-68). The Appeals Council denied Ms. Epps's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 5-11; *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481). Ms. Epps timely filed this action on July 27, 2023. (ECF #1).

Factual Background

## I.     Personal and Vocational Evidence

Ms. Epps was 49 years old on the alleged onset date and 53 years old at the administrative hearing. (Tr. 354). She previously worked as a self-employed elderly caregiver. (Tr. 178).

## II.     Relevant Medical Evidence

On February 21, 2019, Ms. Epps met with primary care physician Douglas Van Auken, M.D., for follow up regarding her cervical spine. (Tr. 1025-28). There, she reported doing somewhat better, felt gabapentin was helpful, and was considering cervical spine surgery to relieve symptoms in her shoulders and arms. (Tr. 1026). Physical examination revealed neck tension and increased pain in the shoulders and arms with range of motion testing. (Tr. 1027). Dr. Van Auken provided prescriptions for Valium, hydroxyzine, and gabapentin. (Tr. 1028).

On April 17, 2019, Ms. Epps met with Margaret Onyeukwu, APRN-CNP, for a mental health assessment update and medication management. (Tr. 955-72). There, Ms. Epps reported a depressed mood, loss of interest in activities, loss of energy and motivation, poor sleep, feelings of helplessness and guilt, irritability, excessive worry, restlessness, muscle tension, and feeling easily fatigued. (Tr. 960). She also described having panic attacks when in stores. (Tr. 961). During the assessment, NP Onyeukwu noted Ms. Epps was cooperative, anxious, sad, and tearful with a

2

depressed and irritable mood and congruent effect. (Tr. 963). Mental status examination otherwise revealed normal speech, thought process, and thought content. (*Id.*). Ms. Epps reported poor concentration, but NP Onyeukwu noted sustained concentration and normal memory. (*Id.*). Her judgment and insight were deemed "questionable." (*Id.*). NP Onyeukwu diagnosed Ms. Epps with general anxiety disorder, major depressive disorder, and polysubstance use disorders. (*Id.*). She continued Ms. Epps's prescription for hydroxyzine and prescribed Lexapro and Lamictal. (Tr. 964).

On December 20, 2019, Ms. Epps visited the emergency department for worsening neck pain, bilateral shoulder pain, and back pain for several weeks. (Tr. 1193). She described numbness and tingling in the bilateral biceps. (*Id.*). A CT scan revealed "multilevel degenerative/disc changes, superimposed upon congenital shortening of the pedicles producing multilevel spinal canal and foraminal narrowing, with severe spinal narrowing at C3-C4 with mass effect on the cord due to a large central disc herniation." (Tr. 1206). Except for some diminished strength in the upper extremities, Ms. Epps's neurological examination was normal. (Tr. 1196).

On physical examination, the treating provider noted tenderness to palpation of the cervical spine and sacrum. (*Id.*). Fredrick Junn, M.D., determined an MRI was necessary, which required surgical removal of a non-functional sacral nerve stimulator. (Tr. 1197; *see also* Tr. 1208). Ms. Epps was admitted to the hospital. (Tr. 1208). The following day, Dr. Junn removed the sacral nerve stimulator without difficulty. (*Id.*). Thereafter, a cervical MRI confirmed the finding of cord compression. (Tr. 1209; *see also* Tr. 1255). Dr. Junn determined surgery was appropriate and elected to place a disc arthroplasty at C3-C4 and remove the additional posterior osteophyte to decompress the area rather than perform surgical fusions. (*Id.*). A post-surgical MRI revealed improved central canal patency at C3-C4, mild edema and subcutaneous emphysema, and

redemonstration of residual foraminal narrowing at C3-C4 as described in the prior MRI. (Tr. 1257-58). Ms. Epps left the hospital on December 23, 2019. (Tr. 1378). Dr. Junn provided a note indicating Ms. Epps was unable to work due to surgery and her return-to-work date would be determined at a later time. (Tr. 1423).

On December 24, 2019, Ms. Epps returned to the emergency department with complaints of post-op neck pain. (Tr. 1449). She explained she left the hospital on December 23 against medical advice because she did not feel she was being cared for and, as a result, did not receive medication for pain control. (Tr. 1451). After consultation with Dr. Junn, the treating physician prescribed Norco and directed Ms. Epps to follow up with Dr. Junn at his office. (Tr. 1456).

On May 4, 2020, Ms. Epps returned to the emergency department with right flank pain wrapping around her back and lasting four days, dark urine, fever, and chills. (Tr. 1618). Abdominal imaging revealed a mildly large right kidney. (Tr. 1621). The attending provider felt Ms. Epps had pyelonephritis and hypokalemia and prescribed Bactrim. (Tr. 1623).

On July 20, 2020, a cervical spine X-ray revealed intact and well-seated hardware and degenerative anterior disc osteophyte complex from C4 to C7. (Tr. 2096).

On September 21, 2020, Ms. Epps met with Anthony Petruzzi, PA-C, to establish care and obtain a prescription refill. (Tr. 1733-38). PA Petruzzi provided diclofenac gel and naproxen for neck pain, hydroxyzine for anxiety, omeprazole for gastroesophageal reflux disease (GERD), and an inhaler for asthma. (Tr. 1736-37).

On October 15, 2020, Ms. Epps presented at the emergency department with upper abdominal pain. (Tr. 1612). Physical examination was notable for abdominal tenderness and a positive Murphy's sign indicating an inflamed gallbladder. (Tr. 1614). An abdominal CT revealed

4

a distended gallbladder. (Tr. 1615). She was advised to schedule a gallbladder ultrasound. (*Id.*). The ultrasound, dated October 19, 2020, revealed "gallbladder sludge versus non-shadowing gallstones." (Tr. 1631).

On March 12, 2021, Ms. Epps called her doctor's office and complained of trouble breathing. (Tr. 1888-89). She described a history of well-controlled asthma and a ten-day history of shortness of breath with walking short distances (such as to the mailbox), coughing, and some chest pain. (Tr. 1889). The doctor ordered testing to confirm a viral infection and directed Ms. Epps to self-isolate. (Tr. 1888).

On March 17, 2021, Ms. Epps presented at a telehealth session with PA Petruzzi and reported that her asthma was much worse than before. (Tr. 1885). She described dyspnea with any exertion and reported using her friend's nebulizer. (*Id.*). PA Petruzzi diagnosed her with mild intermittent asthma without complication and prescribed two different inhalers, a short course of Medrol, and an albuterol nebulizer solution and encouraged Ms. Epps to stop smoking. (*Id.*).

On June 30, 2021, Ms. Epps presented at a telehealth session with PA Petruzzi for a wellness exam and reported that naproxen, omeprazole, and hydroxyzine were not effective. (Tr. 1875). Ms. Epps also complained of trigger finger of the right ring finger. (*Id.*). PA Petruzzi prescribed diclofenac gel and tablets for her neck pain, pantoprazole for GERD, and buspirone for anxiety and referred Ms. Epps for a hand evaluation. (*Id.*).

On January 12, 2022, Ms. Epps went to the emergency department with complaint of a gallbladder flare-up. (Tr. 1782). An ultrasound revealed marked thickening of the gallbladder wall, suggestive of acute cholecystitis. (Tr. 1830). Ms. Epps was admitted to the hospital for IV antibiotics and possible surgical intervention. (Tr. 1786, 1792). The following day, she underwent

a laparoscopic cholecystectomy to remove the gallbladder and an epigastric lipoma. (Tr. 1793). She was discharged in stable condition on January 14, 2022. (Tr. 1801).

On February 22, 2022, Ms. Epps met with PA Petruzzi and reported lower back pain into the left sciatic notch and down to the mid-thigh. (Tr. 1856-57). PA Petruzzi prescribed diclofenac gel and baclofen and provided in-office Toradol and Kenalog injections. (Tr. 1857).

On February 26, 2022, Ms. Epps called PA Petruzzi's office and described the return of severe left hip pain that shoots into the left leg and is aggravated by sitting up, standing, and walking, and causes her leg to give out. (Tr. 1854-44).

On March 25, 2022, Ms. Epps met with PA Petruzzi for evaluation of left-sided lower back pain radiating down the side of the leg. (Tr. 1942). Physical examination revealed tenderness with normal range of motion. (*Id.*). PA Petruzzi provided in-office Toradol and Kenalog injections and a prescription for gabapentin. (*Id.*).

On August 8, 2022, Ms. Epps returned to PA Petruzzi's office and described a cough, dyspnea, wheezing, and using her inhaler more often. (Tr. 2202). PA Petruzzi suspected pneumonia and prescribed azithromycin, benzonatate, and prednisone and refilled her prescription for albuterol nebulizer solution. (Tr. 2202-03).

## III.    Medical Opinions

On October 27, 2020, Ms. Epps attended a consultative psychological examination with Natalie Whitlow, Ph.D. (Tr. 1704-13). Dr. Whitlow summarized the evaluation as follows:

> In reference to her mental health, the claimant identified PTSD as her disabling mental health condition. However, she did not adequately substantiate this claim. Additionally, the claimant observed aspects of her presentation that she was not giving voice to and, after offering the claimant interpersonal feedback, she began identifying longstanding symptoms related to snappiness, irritability, poor attention span, concentration, and focus, difficulty following through on and completing

6

tasks, irresponsibility, poor decision-making, and difficulty in interpersonal interactions. The claimant presented with irritability and agitation, impatience, snappiness, emotional lability, and emotional fragility, scattered and disorganized thought patterns and reports, and difficulty staying on task and adequately completing tasks. The claimant also reported a history of academic problems, incarcerations, substance abuse, and difficulty functioning within the work world, as well as long standing interpersonal issues.

(Tr. 1711-12). Dr. Whitlow also noted Ms. Epps engaged in heavy breathing at times and related this to her asthma. (Tr. 1709). Dr. Whitlow diagnosed Ms. Epps with bipolar disorder and assessed Ms. Epps's ability to function, determining as follows:

**Describe the claimant's abilities and limitations in understanding, remembering, and carrying out instructions.**

From a mental health perspective, the claimant does not appear to have debilitating limitations with understanding or remembering instructions.

The claimant appears to have limitations with carrying out instructions, which is evidenced by her Bipolar I disorder diagnosis that has accompanying symptoms that include irritability and mood instability that result in the claimant not having the level of patience to persist through a task to adequately carry out instructions, as well as symptoms of rapid and excessive thought patterns, a flight of ideas, and an increase in goal directed activity, all of which can serve to interfere with the claimant's persistence and productivity, also diminishing her ability to carry out instructions. Additionally, the current evaluator observed the claimant's difficulty with adequately carrying out the instructions of the evaluation.

**Describe the claimant's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace to perform simple tasks and to perform multi-step tasks.**

The claimant appears to have limitations on this functional assessment area, which is evidenced by her Bipolar I disorder diagnosis that has accompanying symptoms that include rapid and excessive thought patterns, a flight of ideas, and an increase in goal directed activity, all of which can serve to interfere with the claimant's persistence and productivity, diminishing her ability to follow through on tasks and complete tasks, as well as symptoms of irritability and mood instability that result in the claimant not having the level of patience to persist through a task to adequately complete it.

Additionally, the current evaluator observed the claimant's difficulty with adequately completing the tasks of the evaluation, without a great deal of support and assistance.

**Describe the claimant's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting.**

The claimant appears to have limitations on this functional assessment area, which is evidenced by her Bipolar I disorder diagnosis that has accompanying symptoms that include irritability and mood instability that result in the claimant not possessing adequately levels patience, being irritable, and engaging with people in a snappy and short manner the has caused her to experience interpersonal conflict, in the past. Additionally, the current evaluator experienced the claimant's difficulty with adequately interacting with her, during the evaluation.

**Describe the claimant's abilities and limitations in responding appropriately to work**
**pressures in a work setting.**

The claimant appears to have limitations on this functional assessment area, which is evidenced by her Bipolar I disorder diagnosis that has accompanying symptoms that interfere with her thought processing, performance and productivity, mood and general stability, ability to present herself in a professional manner, and interpersonal functioning.

(Tr. 1712-13).

On September 12, 2021, State agency medical consultant Dana Schultz, M.D., reviewed Ms. Epps's medical records. (Tr. 354-61). Noting that Ms. Epps did not attend any of the three consultative physical examinations scheduled on her behalf, Dr. Shultz concluded there was insufficient evidence to make a determination. (Tr. 357). At the administrative hearing, Ms. Epps explained she was without adequate transportation to attend the physical consultative examinations. (Tr. 189-90). State agency psychological consultant Paul Tangeman, Ph.D., found moderate limitations in Ms. Epps's abilities to understand and remember detailed instructions, carry out detail instructions, maintain attention and concentration for extended periods of time, perform activities within a schedule and maintain a schedule, work in coordination or proximity

8

to others without distraction, and complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace. (Tr. 359-60). Dr. Tangeman also reviewed Dr. Whitlow's opinion and found it to be consistent with the other medical evidence of record. (Tr. 359). Given her limited concentration and focus and her easy frustration with others, Dr. Tangeman determined Ms. Epps is limited to simple, repetitive tasks without strict time or production quotas. (Tr. 360). Dr. Tangeman also found moderate limitations in Ms. Epps's abilities to interact appropriately with the general public, accept instruction and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting. (*Id.*). Because of her loud speech and short temper, which may be off-putting, Dr. Tangeman determined Ms. Epps is limited to minimal and superficial contact with others and will require additional support when work processes change. (*Id.*).

On reconsideration, the State agency medical and psychological consultants noted Ms. Epps failed to respond to any requests for additional information and therefore failed to cooperate. (Tr. 377) As a result, both consultants concluded the prior evaluations could not be affirmed. (*Id.*).

## IV.    Administrative Hearing

Ms. Epps lives with her brother, son, and nephew. (Tr. 177). She stopped working as a caregiver in 2017 because of her anxiety and the pain in her neck, back, and arms. (Tr. 181). In 2019, Ms. Epps had cervical spine surgery to relieve neck pain and bilateral arm numbness. (*Id.*).

Six months after the surgery, Ms. Epps's neck pain and arm numbness returned. (*Id.*). She also has sciatica for which she receives injections. (Tr. 184, 187). Gabapentin helps take the edge

off but does not completely relieve her pain. (Tr. 182). Ms. Epps also has asthma and testified she

can walk for about twenty steps before she needs to stop "because of [her] breathing." (*Id*.). She

finds herself "breathing hard" after climbing ten steps. (Tr. 184). She uses an inhaler once or twice

a day and uses a nebulizer to administer breathing treatments three to four times a day. (Tr. 183).

Breathing treatments last about twenty minutes each. (Tr. 188). Ms. Epps testified she can

comfortably lift five pounds and stand for fifteen to twenty minutes before resting. (Tr. 184).

When sitting, she must shift positions after about ten minutes to relieve sciatic pain. (*Id*.). Ms.

Epps also has mental health impairments for which her primary care physician prescribes Buspar.

(*Id*.). She experiences mood swings. (Tr. 185) ("I can be happy one minute and going off the

next"). About ten days a month, she struggles to get out of bed because she is depressed. (Tr. 190).

In a typical day, Ms. Epps gets up, eats breakfast, showers, and goes back to her room to

watch television or goes somewhere she can sit and be alone. (Tr. 185). A friend helps her carry

laundry to and from the basement. (Tr. 189). The numbness in her arms affects her hands and

sometimes makes it difficult to pick things up or maintain a grip on items such as dishes, cups,

pens, and hairbrushes. (Tr. 191). She goes to the store once or twice a week and prepares simple

meals for herself. (Tr. 186). Ms. Epps limits the duration of grocery trips to ten or fifteen minutes

because she does not like to be around others. (Tr. 189). She regularly interacts with her son and

one friend. (Tr. 186). When she gets together with her friend, they typically go to the park and sit.

(Tr. 192).

The VE testified that a person of Ms. Epps's age, education, and experience, with the

limitations described in the ALJ's residual functional capacity (RFC) determination, could not

perform her past relevant work as a caregiver but could perform jobs including checker, marker,

and collator operator. (Tr. 195-96). Additionally, the VE testified most employers tolerate up to 9% off-task time and no more than eleven unexcused absences per year. (Tr. 199).

## V.     Adult Function Report

A representative completed an Adult Function Report on Ms. Epps's behalf. (Tr. 686-93). The representative reported that Ms. Epps has limited arm mobility due to a pinched spinal cord, neck and arm numbness that limits her ability to grasp items for a long period of time, asthma, depression, anxiety, and PTSD. (Tr. 686). Ms. Epps cannot walk or stand for long periods of time due to a prior knee injury. (*Id.*). On a typical day, Ms. Epps awakens, has breakfast, takes her medication, watches television, helps look after her 13-year-old nephew, does light housework and laundry, eats dinner, and goes to bed. (Tr. 687). Housework includes vacuuming, wiping down surfaces, doing laundry, loading the dishwasher, and making the bed. (Tr. 688). Ms. Epps does not sleep well due to contact pain in her neck, back, and knees. (Tr. 687). She largely handles her own personal care, but her brother or son helps wash her hair. (*Id.*). Ms. Epps's social activities are limited to watching television, sitting with her family daily, and visiting her friend once a week. (Tr. 690).

The constant pain in her knees and back affect her abilities to lift, squat, bend, stand, reach, walk, sit, climb stairs, and use her hands. (Tr. 691). Anxiety, depression, and PTSD contribute to difficulties with memory, concentration, following instructions, and completing tasks. (*Id.*). Ms. Epps can walk for five minutes before needing to rest, pay attention for about six minutes at a time, does not finish what she starts, and cannot handle stress. (Tr. 691-92). She can follow written, but not spoken, instructions and does not like change but can adjust to it. (Tr. 692).

STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905; *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520, 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the

duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f), 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

THE ALJ'S DECISION

At Step One, the ALJ determined Ms. Epps had not engaged in substantial gainful activity since November 1, 2018. (Tr. 149). At Step Two, the ALJ identified the following severe impairments: degenerative disc disease of the cervical spine status post discectomy and fusion surgery, cervical spine spondylosis and radiculopathy, sciatica, lumbar disc lesion, generalized anxiety disorder, and bipolar disorder. (*Id.*).

At Step Three, the ALJ found Ms. Epps does not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment. (Tr. 150). The ALJ determined Ms. Epps's RFC as follows:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except with the following additional limitations. The claimant can frequently climb ramps and stairs, but cannot climb ladders, ropes, or scaffolds. The claimant can frequently stoop, kneel, and crouch, and can occasionally crawl. The claimant should avoid exposure to dangerous moving machinery and unprotected heights. The claimant can perform simple, routine tasks, in an environment free of fast-paced production requirements or strict production quotas and with no more than occasional changes in workplace tasks or duties with changes explained in advance. The claimant can have occasional interaction with coworkers and the general public. The claimant should perform no work tasks that involve customer service duties, confrontation, conflict resolution, collaboration, directing the work of others, persuading or influencing others, or being responsible for the safety or welfare of others.

(Tr. 152-53).

At Step Four, the ALJ found Ms. Epps has past relevant work as a caregiver but cannot perform in that position. (Tr. 157). At Step Five, the ALJ determined jobs exist in significant

numbers in the national economy that Ms. Epps can perform, including checker, marker, and collator operator. (Tr. 158). Therefore, the ALJ found Ms. Epps was not disabled. (*Id.*).

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is

14

a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); accord *Shrader v. Astrue*, No. 11 13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## DISCUSSION

Ms. Epps brings two issues for review. First, she claims the ALJ failed to develop the record regarding her physical impairments and, as a result, crafted an RFC uninformed by any medical opinion evidence. (ECF #11 at PageID 2259-61). Second, Ms. Epps claims the ALJ did not properly evaluate Dr. Whitlow's medical opinion and the ALJ's reason for dismissing it—that it was

vague and did not identify the extent of her limitations—was without merit because no other medical opinion supports the ALJ's conclusions. (*Id.* at PageID 2261-64).

In response to the first argument, the Commissioner states "the ALJ is not required to rely on a particular medical opinion in deciding the issue of RFC but was required to consider the overall record evidence and come to her own independent conclusions," and did so. (ECF #13 at PageID 2276). As to the ALJ's evaluation of Dr. Whitlow's opinion, the Commissioner contends the evaluation was proper because the ALJ considered both the supportability and consistency of the opinion. (*Id.* at PageID 2279-80).

For the reasons that follow, I find the Commissioner's arguments unpersuasive on the first issues, but well taken as to the second. Because the error on the first is ultimately controlling, I recommend the District Court **REVERSE** the ALJ's decision and **REMAND** this matter for further proceedings.

## I.     The RFC assessment is not supported by substantial evidence.

A claimant's RFC is defined as the most a claimant can still do despite the physical and mental limitations resulting from his impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). The ALJ alone determines a claimant's RFC. *Id.* at §§ 404.1546(c), 416.946(c). The RFC must be based on all relevant evidence in the record, including medical evidence, medical reports and opinions, the claimant's testimony, and statements the claimant made to medical providers. *Id.* at §§ 404.1545(a), 416.945(a); *see also Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010). The Sixth Circuit has declined to adopt a rule "directing that medical opinions must be the building blocks of the [RFC] finding"; rather, "the [ALJ] must make a connection between the evidence relied on and the conclusion reached." *Tucker v. Comm'r*

*of Soc. Sec.,* 775 Fed. App'x 220, 226 (6th Cir. 2019). Remand may be appropriate, however, where the "ALJ makes a finding of work-related limitations based on no medical source opinion or an outdated source opinion that did not include consideration of a critical body of objective medical evidence." *Jones v. Comm'r of Soc. Sec.,* 3:21-cv-025, 2022 WL 10686665 (quotation omitted).

When assessing the RFC, ALJ's "must not succumb to the temptation to play doctor and make their own independent medical findings." *Simpson v. Comm'r of Soc. Sec.,* 344 F. App'x 181, 194 (6th Cir. 2009). In other words, the ALJ may not interpret raw medical data in functional terms. *Smiley v. Comm'r of Soc. Sec.,* 940 F. Supp. 2d 592, 601 (S.D. Ohio Feb. 4, 2013) (citation omitted). A functional capacity opinion from a medical source may not be necessary in every case, such as where the medical evidence "shows relatively little physical impairment," allowing the ALJ to render a commonsense judgment about functional capacity even without a physician's assessment. *Deskin v. Comm'r of Soc. Sec.,* 605 F. Supp. 2d 908, 912 (N.D. Ohio Mar. 31, 2008). This exception applies in a "limited" number of cases "when the medical evidence is so clear, and so undisputed, that an ALJ would be justified in drawing functional capacity conclusions from such evidence without the assistance of a current medical source." *Harris v. Comm'r of Soc. Sec.,* No. 15-10966, 2016 WL 8114128, at *10 (E.D. Mich. Mar. 2, 2016), *report and recommendation adopted,* 2016 WL 2848422 (E.D. Mich. May 16, 2016) (citations omitted). But when the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations, as here, the ALJ may have the obligation to develop the record by using the tools provided in the regulations for ordering additional evidence, such as "recontact[ing] the treating physician, order[ing] a consultative examination, or hav[ing] a medical expert testify at the hearing." *Deskin,* 605 F. Supp. 2d at 912.

Here, the only medical source statement relating to Ms. Epps's physical limitations comes from her neck surgeon, Dr. Junn, who determined she could not work, beginning December 1, 2019, due to an injury and subsequent surgery and that her ability to work would be re-evaluated in the future. (Tr. 1423). The ALJ rejected the opinion as temporary in scope and conclusory, offering no guidance regarding function-by-function restrictions. (Tr. 157). As such, Ms. Epps's record is bereft of medical opinions regarding her physical impairments. *See* 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1) (statement from a medical source that an individual is "disabled" or "unable to work" is not a medical opinion but an issue reserved to the Commissioner). Though two State agency consultants reviewed the record, both determined there was insufficient evidence to evaluate Ms. Epps's RFC. (Tr. 366, 377). Undeterred by the lack of evidence, the ALJ concluded the State agency opinions were "inconsistent with updated records showing severe disc herniation at C3-4 and resultant surgery, to name but some of the evidence of serious physical impairment in this record" and found Ms. Epps has the capacity for light exertion work with additional limitations "per the history of musculoskeletal impairment" and "pain and weakness." (Tr. 154, 155). But these were not "updated" records the State agency consultant did not have the opportunity to review; indeed, the consultant reviewed those records and still determined the evidence was insufficient to make a finding. (Tr. 365). Thus, it is not clear, and the decision does not explain how, the ALJ could make a detailed RFC finding when the reviewing State agency physicians could not. Because there was no medical opinion evidence on Ms. Epps's functional limitations, the ALJ had the responsibility to develop the record further.

The administrative transcript indicates the Commissioner attempted to develop the record, but Ms. Epps never attended any of the four consultative examinations scheduled to evaluate her

physical impairments, two of which Ms. Epps could not attend due to transportation issues and two of which were canceled either by the consultative examiner or the State agency. (*See* Tr. 711-15). When a claimant does not have a good reason for failing or refusing to take part in a consultative examination or test, the ALJ may find that claimant not disabled based on that alone. *See* 20 C.F.R. §§ 404.1518, 416.918. But here, the ALJ did not analyze Ms. Epps's reasons for not attending those examinations or explain how that informed her disability determination; rather, the ALJ evaluated the medical evidence and, without guidance from any medical source, interpreted medical data into functional limitations. As the ALJ herself concluded, the record reveals "serious physical impairment," not "relatively little physical impairment" that would allow the ALJ to render a commonsense judgment about functional capacity without a physician's assessment. Therefore, I can only conclude the ALJ's RFC assessment is not supported by substantial evidence. As such, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** for proceedings consistent with this recommendation.

## II.    The ALJ properly evaluated Dr. Whitlow's opinion and her determination is supported by substantial evidence.

Next, Ms. Epps takes issue with the ALJ's evaluation of Dr. Whitlow's opinion, asserting the ALJ erred when she found the opined limitations too vague. (ECF #11 at PageID 2262).

In determining the persuasiveness of a medical opinion, the ALJ considers five factors: (1) supportability; (2) consistency; (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors that tend to support or contradict a medical opinion. 20 C.F.R. §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5). The ALJ must explain how she considered the factors of supportability and consistency, and "may, but [is] not required to"

19

explain the remaining factors of relationship with the claimant, specialization, or other factors, absent the ALJ's finding that two opinions are "equally" persuasive. *See* 20 C.F.R. §§ 404.1520c(b)(2)-(3), 416.920c(b)(2)-(3). I look to the whole document when reviewing the ALJ's decision. *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014). The ALJ must make the reasons for the supportability and consistency analysis sufficiently clear for subsequent review to determine whether substantial evidence supports the claimant's disability determination. *Id.* "So long as the ALJ's decision adequately explains and justifies its determination as a whole, it satisfies the necessary requirements to survive this court's review." *Norris v. Comm'r of Soc. Sec.*, 461 F. App'x 433, 440 (6th Cir. 2012).

Here, the ALJ evaluated Dr. Whitlow's opinion as follows:

> I find some persuasive effect in the opinion of consultative examiner Dr. Natalie Whitlow, Ph.D., who stated the claimant has a diminished capacity in task persistence and carrying out instructions, has limitations in the ability to respond appropriately to supervision and coworkers in a work setting, and would have limitations in ability to respond appropriately to work pressures. Dr. Whitlow's opinion is supported by her observations and evaluation of the claimant, as well as a discussion of the claimant's presentation during the consultative examination. However, I find only some persuasiveness in her assessment due to the vague language of the statement. Dr. Whitlow does not clearly identify exactly *how* limited she believes the claimant to be, regarding function-by-function limitations. Dr. Whitlow's observations are not consistent with the other medical evidence in the record as discussed above where the claimant has received little treatment for psychological impairments, consisting mostly of medication from her primary care [physician], and is generally noted to have unremarkable mental status exams at office visits.

(Tr. 156) (cleaned up, citations omitted). The ALJ's analysis properly considers both the supportability and consistency of Dr. Whitlow's opinion. The ALJ found Dr. Whitlow's opinion supported by her own observations at the appointment but inconsistent with numerous unremarkable mental status examinations and the limited treatment Ms. Epps received for her

mental health impairments. Because the ALJ addressed both supportability and consistency and her conclusions are supported by substantial evidence, I decline to recommend remand on this basis.

Ms. Epps takes issue with the ALJ's conclusion that Dr. Whitlow's assessment was too vague and claims the ALJ had a duty to gather more evidence. (ECF #11 at PageID 2264) ("Further, if [the ALJ] found Dr. Whitlow's assessment regarding [her] functioning too vague, [s]he had a duty to resolve this conflict by issuing interrogatories, eliciting testimony from a medical expert, or ordering another consultative examination."). As discussed above, the ALJ may have an obligation to develop the record when it lacks evidence sufficient to determine when a claimant is disabled. That is not the case here. Dr. Tangeman reviewed the medical evidence, including Dr. Whitlow's opinion, and assessed Ms. Epps's residual mental functional capacity. From this, the ALJ found Dr. Tangeman's opinion more persuasive:

> I find persuasive effect in the opinion of the state agency psychologist Dr. Paul Tangeman, Ph.D., who stated the claimant could perform simple, routine tasks without strict time or production quotas, could have minimal and superficial contact with others, and will need additional support when work processes change. Dr. Tangeman's opinion is supported by a review and discussion of the available medical evidence, and by narrative explanation of how that evidence informs his conclusions. Dr. Tangeman's opinion is consistent with the claimant's anxious and irritable presentation at the October 27, 2020 consultative examination, but also is consistent with a record that reflects limited counseling for psychological symptoms, and reflects no need for emergency or inpatient treatment for the same.

(Tr. 156) (cleaned up, citations omitted). More to the point, when a medical opinion does not actually describe the extent of functional limitations, the ALJ may properly consider the opinion too vague and, subsequently, less persuasive. *See Quisenberry v. Comm'r of Soc. Sec.,* 757 F. App'x 422, 434 (6th Cir. 2018).

Ms. Epps also notes Dr. Tangeman reviewed a limited set of treatment records, dated though September 2019, and most of the available medical documentation was admitted to the record after that date (ECF #11 at PageID 2263), suggesting the ALJ's reliance on the opinion is not supported by substantial evidence. As described above, courts within the Sixth Circuit have concluded that an updated medical opinion may be necessary "where a 'critical body' of 'objective medical evidence' is not accounted for by a medical opinion and there is significant evidence of potentially disabling conditions." *McCauley v. Comm'r of Soc. Sec.,* No. 3:20-CV-13069, 2021 WL 5871527, at *14-15 (E.D. Mich. Nov. 17, 2021), *report and recommendation adopted,* 2021 WL 5867347 (E.D. Mich. Dec. 10, 2021); *Kizys,* 2011 WL 5024866, at *2. To be clear, the extent of Ms. Epps's mental health treatment is, itself, quite limited. She attended a mental health evaluation in April 2019, a consultative examination with Dr. Whitlow in October 2020, and received medication for anxiety from her primary care physician. (Tr. 955-72, 1736-37, 1875). Outside of the April 2019 evaluation and the consultative evaluation with Dr. Whitlow, the ALJ noted the limited treatment for mental health issues and that treating providers consistently documented unremarkable mental status examinations (Tr. 156), findings supported by substantial evidence in the record (*See* Tr. 1614, 1620, 1783, 1875, 2156). As such, there is not a critical body of evidence pertaining to Ms. Epps's mental impairments that is not accounted for by a medical opinion; therefore, the ALJ was not required to secure additional evidence in order to assess Ms. Epps's mental impairments.

For these reasons, I decline to recommend remand based on the second ground Ms. Epps advances.

CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **REVERSE** the Commissioner's decision denying disability insurance benefits and supplemental security income and remand for additional proceedings consistent with this recommendation.

Dated: June 4, 2024

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).